IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DEPOSITORS INSURANCE            *
COMPANY, et al.,
                                *
        Plaintiffs,
                                *

ZURICH AMERICAN INSURANCE       *
COMPANY, et al.,
                                *
        Intervenor Plaintiffs,
                                *
v.
                                *
W. CONCRETE, INC. et al.,
                                *
        Defendants,                         Civil Action No. GLR-16-1018
                                *

*     *     *     *     *     *     *     *     *     *     *     *     *

FOUGLER-PRATT CONTRACTING,      *
LLC,
                                *
        Third-Party Plaintiff,
                                *
v.
                                *
NATIONAL UNION FIRE INSURANCE
CO. OF PITTSBURGH, PA., et al.,  *

        Third-Party Defendants.  *

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on five Motions: (1) Plaintiffs Depositors Insurance

Company ("Depositors") and AMCO Insurance Company's ("AMCO") (collectively,

"Nationwide") Motion for Summary Judgment (ECF No. 52); (2) Defendant Facchina

Construction Company, Inc.'s ("Facchina") Cross-Motion for Partial Summary Judgment (ECF No. 61); (3) Defendant W. Concrete, Inc.'s ("W. Concrete") Cross-Motion for Partial Summary Judgment (ECF No. 62); (4) Defendant Fougler-Pratt Contracting, LLC's ("FPC") Cross-Motion for Partial Summary Judgment (ECF No. 63); and (5) Nationwide's Motion to Strike FPC's Reply Affidavits or, in the alternative, for Leave to File Surreply (ECF No. 75). The Motions are fully briefed and ripe for disposition. No hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons that follow, the Court will grant in part and deny without prejudice in part Nationwide's Motion for Summary Judgment (ECF No. 52). The Court will also deny Defendants' Cross-Motions for Partial Summary Judgment (ECF Nos. 61–63) and deny as moot Nationwide's Motion to Strike (ECF No. 75).

## I.   BACKGROUND[1]

### A.   SSTC Construction

This declaratory action is an insurance-coverage dispute stemming from Defendants' allegedly nonconforming construction work on the Silver Spring Transit Center ("SSTC") in Montgomery County, Maryland (the "County"). The SSTC is a "full-service, multi-modal transit facility adjacent to the Silver Spring Metrorail Station." (County and WMATA's Third Am. Compl. ["Underlying Compl."] ¶ 15, ECF No. 52-3).

---

[1] The Court draws the majority of the facts that follow from the pleadings in both this action and the underlying action in the Circuit Court for Montgomery County, Maryland. To the extent that the Court draws facts from affidavits or declarations, those facts are undisputed and construed in the light most favorable to the non-movant.

Around 1999, the County approached the Washington Metropolitan Area Transit Authority ("WMATA") about constructing the SSTC. (Id. ¶¶ 15–16). WMATA expressed interest in the project, and bilateral discussions ensued. (Id. ¶¶ 16–17). The County and WMATA eventually agreed that the County would lead the design and construction of the SSTC; WMATA would provide design input, but no direct financial contribution. (Id. ¶ 17). The County and WMATA further agreed that once the SSTC was substantially complete, the County would convey it to WMATA, who would then be responsible for operating, managing, and maintaining the SSTC. (Id. ¶¶ 18–19). In 2004, the County and WMATA memorialized their agreements in a memorandum of understanding, which they later amended in 2008. (Id. ¶ 20).

In September 2008, the County contracted with FPC to serve as the general contractor for the SSTC's construction at a total fixed price of nearly $66 million. (Id. ¶ 60). The construction contract between the County and FPC (the "Prime Contract") incorporated the SSTC's design plans and technical specifications. (See id. ¶ 61). The design plans contemplated a three-level concrete structure (the "Structure") comprising a ground level (Level 305) and two elevated levels (Levels 330 and 350). (Id. ¶ 100). The ground level would consist of "on grade" concrete slabs, and the elevated levels would consist of post-tensioned and steel-reinforced concrete slabs. (Id. ¶¶ 101–102).

In December 2008, FPC subcontracted with Facchina to perform the SSTC's concrete work for a total price of approximately $17.3 million. (FPC's Am. 3d-Party Compl. ¶ 3, ECF

No. 1-5); (ECF No. 61-1 at 37).  Facchina then subcontracted with five companies to complete concrete work on the SSTC's elevated levels: (1) Gerdau Ameristeel US, Inc. to supply the reinforcing steel bars ("rebar"); (2) VStructural LLC to supply the post-tensioning materials; (3) R&R Reinforcing, Inc. to install the rebar and post-tensioning materials; (4) Rockville Fuel and Feed Company, Inc. ("Rockville") to supply the concrete; and (5) W. Concrete to "place and finish" the concrete that Rockville supplied.  (Anderson Decl. ¶ 4a to 4e, ECF No. 61-1).

For an initial contact price of approximately $63,000, W. Concrete agreed in its subcontract (the "W. Concrete Subcontract") to place concrete over top of and through the rebar and post-tensioning ducts with the thickness, cover, and finish that the Prime Contract required.  (Id. ¶ 4e); (Facchina's 4th-Party Compl. ¶ 8, ECF No. 1-6); (Facchina's Answer Ex. 1 ["W. Concrete Subcontract"] at 10, ECF No. 42-1).  The W. Concrete Subcontract also obligated W. Concrete to obtain liability insurance and name FPC, Facchina, and the County as additional insureds.  (W. Concrete Subcontract at 5, 12).

W. Concrete began placing concrete on the SSTC's elevated levels in September 2010. (Underlying Compl. ¶ 107).  Sometime thereafter, the County observed cracking, chipping, and spalling (collectively, "cracking") of the concrete throughout the Structure.  (Id.).  These conditions were not common for new concrete construction.  (Id.).  The cracking "was so severe that, when it rained, water drained through [the] cracks."  (Id.). The County also observed that "in a number of places," the post-tensioning ducts and rebar, which were supposed to be embedded below the surface of the elevated concrete slabs, "had become

exposed." (Id.). After more carefully evaluating the concrete placed on the elevated levels, the County discovered that W. Concrete "had failed to pour portions of the slabs to the required ten inch thickness." (Id. ¶ 108).

Due to (1) the cracked and thin concrete and (2) exposed post-tensioning ducts and rebar, the County was unable to obtain the requisite Use and Occupancy Permit for the Structure. (Id. ¶ 109). In response, the County retained KCE Structural Engineers, P.C. ("KCE") "to review and analyze all aspect of the design and construction of the SSTC and to make recommendations to remediate any defects it found." (Id. ¶ 113).

In March 2013, KCE issued a report (the "KCE Report") that described "substantial defects" in FPC's construction of the SSTC, including defects in the concrete work that FPC subcontracted with Facchina. (Id. ¶ 114). The KCE Report identified the following specific defects in concrete work:

> a) Thin elevated concrete slabs, which were designed to be ten inches thick but which were no more than [eight] inches thick in some places.
> b) Inadequate concrete cover over interior slab members.
> c) Absence of post-tensioning and mild steel in 330-level pour strips.
> d) Insufficient concrete strength below the required 8,000 [pounds per square inch] in many locations.

(Id. ¶ 116).

The County then requested that multiple parties design remediation plans for the defective concrete work. (Id. ¶¶ 123, 140). Once the plans were complete, the County executed a contract amendment with FPC that authorized FPC to perform the remediation

work that the plans prescribed. (Id. ¶ 141). FPC agreed to reinforce existing concrete beams and girders, apply a latex-modified concrete overlay on the portions of the elevated levels with thin concrete slabs, and repair cracks. (Id.). In addition to the nearly $78 million that the County paid FPC to construct the SSTC, the County paid FPC "millions of dollars for this remediation work, which would have been unnecessary if the job had been done correctly the first time." (Id.).

After obtaining a Use and Occupancy Permit and Certificate of Substantial Completion in July and August 2015, respectively, the County transferred the SSTC to WMATA. (Id. ¶¶ 142, 145, 146). The SSTC opened in September 2015. (Id. ¶ 148). Now that WMATA is responsible for maintaining the SSTC, it anticipates that the concrete defects discussed above will harm it financially by requiring more repairs and maintenance than would have been required without those defects and by shortening the life-span of the SSTC. (Id.).

**B.      W. Concrete's CGL and Umbrella Liability Insurance Policies**

W. Concrete purchased commercial general liability ("CGL") insurance policies from Depositors that provided coverage from April 1, 2010 through April 1, 2016 (the "CGL Policies"). (Am. Compl. ¶ 29, ECF No. 41); (see ECF Nos. 52-7 to 52-12). W. Concrete also obtained umbrella liability insurance policies from AMCO that provided coverage for that same period (collectively with the CGL Policies, the "Policies"). (Am. Compl. ¶ 38); (see ECF Nos. 52-13 to 52-18). Subject to other exceptions and qualifications not relevant to this case, the Policies provide that Nationwide will pay for damages that the insured becomes

legally obligated to pay because of "property damage," but only if the property damage is caused by an "occurrence." (See, e.g., Pls.' Mot. Summ. J. Ex. 5 ["Policy"] at 24, ECF No. 52-7). The Policies also state that Nationwide will have a duty to defend the insured against any "suit" seeking those damages. (See, e.g., id.).

The Policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (See, e.g., id. at 37). The Policies define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." (See, e.g., id. at 38). And the Policies define "suit" as "a civil proceeding in which damages because of . . . 'property damage' . . . to which this insurance applies are alleged." (See, e.g., id.).

## C.    The Underlying Action

In August 2015, the County and WMATA (the "Underlying Plaintiffs") sued FPC, as well as the firms tasked with designing the STTC (the "Design Firm") and inspecting the construction of the SSTC (the "Inspection Firm"), in the Circuit Court for Montgomery County, Maryland (the "Underlying Action"). (Underlying Compl. ¶ 150); (see id. at 6)[2]. In the Underlying Plaintiffs' Third Amended Complaint, the County seeks no less than $50 million in compensatory damages from FPC and the Design Firm for "defective design and construction." (Id. at 6). WMATA seeks no less than approximately $26 million in

---

[2] When citing page numbers, as opposed to paragraph numbers, in the Underlying

compensatory damages from FPC, the Design Firm, and the Inspection Firm for "the additional monitoring, inspection, repair, and maintenance costs [WMATA] will incur over the life of the SSTC as a result of the defective design and construction of the facility, as well as for the additional coordination costs incurred." (Id.). The Underlying Plaintiffs sue FPC for breach of contract, breach of express warranty, negligence, and indemnification. (Id. at 55–59, 67–71).

FPC, in turn, sued Facchina. (See FPC's Am. Third-Party Compl.). In its Amended Third-Party Complaint, FPC asserts that beginning in September 2011, the County contended that Facchina's concrete work on the SSTC is defective. (Id. ¶ 4). FPC further asserts that the County then filed the Underlying Action against FPC in August 2015, seeking damages against FPC for Facchina's allegedly defective concrete work. (Id. ¶ 5). FPC denies that Facchina's concrete work is defective. (Id. ¶ 7). Nevertheless, FPC asserts that in the event that it is determined that Facchina's concrete work is, indeed, defective, Facchina is liable to FPC for any resulting damages or costs. (Id.). FPC sues Facchina for breach of contract, breach of express warranty, negligence, contractual and implied indemnity, and contribution. (Id. at 6–13).

Facchina, in turn, sent a proposed Fourth-Party Complaint to W. Concrete.[3] (See Facchina's 4th-Party Compl.). Facchina alleges that the County identified no less than three

---

Complaint, the Court uses the page numbers that the Court's case management tool assigned.
[3] It does not appear that Facchina filed the Fourth-Party Complaint in the Underlying Action or formally served W. Concrete. (See Am. Compl. ¶ 23) ("Upon information and

purported defects in W. Concrete's placing and finishing work: the concrete (1) does not satisfy the contractual requirements for compressive strength; (2) does not sufficiently cover the rebar and post-tensioning ducts; and (3) is too thin. (<u>Id.</u> ¶ 19–21). Facchina contends that improper placing and finishing could cause all of these purported defects. (<u>Id.</u>). Facchina sues W. Concrete for breach of contract, breach of express warranty, negligence, contractual and implied indemnity, and contribution. (<u>Id.</u> at 6–12).

Defendants sought defense and indemnification from Nationwide under the Policies. (Am. Compl. ¶¶ 27–28). In July 2016, Nationwide denied coverage under the Policies and refused to defend or indemnify Defendants in the Underlying Action. (<u>See</u> ECF No. 61-3 at 107–17).

## D. <u>Relevant Procedural History of this Declaratory Action</u>

In April 2016, Nationwide sued Defendants in this Court, seeking a declaration that the Policies do not obligate Nationwide to defend or indemnify Defendants in the Underlying Action. (Compl., ECF No. 1). Nationwide filed an Amended Complaint in August 2016. (ECF No. 41). Defendants answered and counterclaimed for declaratory judgment and breach of contract. (ECF Nos. 42–44).

Nationwide moved for summary judgment on October 26, 2016. (ECF No. 52). On November 30, 2016, Defendants opposed Nationwide's Motion for Summary Judgment and filed Cross-Motions for Partial Summary Judgment, seeking a declaration that Nationwide

belief, W. Concrete has not yet been named as a party to the Underlying Action.").

must defend them in the Underlying Action and a judgment that Nationwide breached the Policies when it failed to defend them.[4] (ECF Nos. 61–63). On January 19, 2017, Nationwide filed a Combined Opposition to Defendants' Cross-Motions for Partial Summary Judgment and Reply in further support of its Motion for Summary Judgment. (ECF No. 69). On February 21, 2017, Defendants filed their Replies in further support of their Cross-Motions for Summary Judgment. (ECF Nos. 71–73). FPC attached an affidavit from Brooks Foster (the "First Foster Affidavit"), Senior Quality Manager for FPC, to its Reply. (ECF No. 71-1). On February 23, 2017, FPC filed a revised Foster affidavit (collectively with the First Foster Affidavit, the "Foster Affidavits"). (ECF No. 74).

Then, on March 6, 2017, Nationwide moved to strike the Foster Affidavits or, alternatively, for leave to file a surreply. (ECF No. 75). Nationwide attached its proposed Surreply to the Motion. (ECF No. 75-1). Nationwide's Motion was fully briefed as of April 3, 2017. (See ECF Nos. 77, 82).

## II.    DISCUSSION

### A.    Standard of Review

#### 1.    Motion for Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v.

---

[4] Defendants style their Cross-Motions as Cross-Motions for "Partial" Summary Judgment because they move for summary judgment on whether Nationwide is obligated to defend Defendants in the Underlying Action, not whether Nationwide is obligated to defend

DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes

---

and indemnify Defendants.

over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Hooven-Lewis</u>, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

### 2. Cross-Motion for Summary Judgment

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003) (quoting <u>Philip Morris Inc. v. Harshbarger</u>, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." <u>Id.</u> (quoting <u>Wightman v. Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996)). This Court, however, must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. <u>Drewitt v. Pratt</u>, 999 F.2d 774, 778–79 (4th Cir. 1993). If the evidence presented by the nonmovant is merely

colorable, or is not significantly probative, summary judgment must be granted. <u>Anderson</u>, 477 U.S. at 249–50.

**B.    <u>Analysis</u>**

**1.    Is Nationwide Obligated to Defend Defendants in the Underlying Action?**

All parties move for summary judgment on the same legal issue: whether Nationwide has an obligation under the Policies to defend Defendants in the Underlying Action. In Maryland,[5] to determine whether an insurer has an obligation to defend its insured in an underlying tort action, a court considers two questions. <u>St. Paul Fire & Marine Ins. Co. v. Pryseski</u>, 438 A.2d 282, 285 (Md. 1981). First, "what is the coverage and what are the defenses under the terms and requirements of the insurance policy?" <u>Id.</u> Second, "do the allegations in the tort action potentially bring the tort claim within the policy's coverage?" <u>Id.</u> "The first question focuses upon the language and requirements of the policy," while "the second question focuses upon the allegations of the tort suit." <u>Id.</u>

The first question requires the court to construe the insurance policy as a matter of law. Maryland courts construe insurance contracts according to ordinary principles of contract construction. <u>Dutta v. State Farm Ins. Co.</u>, 769 A.2d 948, 957 (Md. 2001) (citing <u>Kendall v. Nationwide Ins. Co.</u>, 702 A.2d 767, 770–71 (Md. 1997)). If the terms of an insurance contract are unambiguous, "a court has no alternative but to enforce those terms." <u>Id.</u> (citing <u>Kendall</u>, 702 A.2d at 773). Although Maryland does not follow the rule that insurance contracts should

---

[5] The parties agree that Maryland substantive law applies in this diversity action. (<u>See</u>

13

be construed against the insurer as a matter of course, any ambiguity will be "construed liberally in favor of the insured and against the insurer <u>as drafter of the instrument</u>." <u>Id.</u> (quoting <u>Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.</u>, 699 A.2d 482, 494 (Md.Ct.Spec.App. 1997)) (internal quotation marks omitted).

As for the second question, "[a]n insurance company has a duty to defend its insured for all claims that are potentially covered under the policy." <u>Walk v. Hartford Cas. Ins. Co.</u>, 852 A.2d 98, 106 (Md. 2004). "Where a potentiality of coverage is uncertain from the allegations of a complaint, any doubt must be resolved in favor of the insured." <u>Aetna Cas. & Sur. Co. v. Cochran</u>, 651 A.2d 859, 863–64 (Md. 1995).

In attempting to establish that there is a potentiality of coverage, an insured may rely on extrinsic evidence, but only if the underlying complaint "neither conclusively establishes nor negates a potentiality of coverage." <u>Walk</u>, 852 A.2d at 106 (quoting <u>Cochran</u>, 651 A.2d at 864) (internal quotation marks omitted); <u>see</u> <u>Md. Cas. Co. v. Blackstone Int'l Ltd.</u>, 114 A.3d 676, 682 (Md. 2015) (ignoring extrinsic evidence because allegations of underlying complaint were conclusive that there was no potentiality of coverage).

Here, the critical terms of the Policies are unambiguous and undisputed—Nationwide is obligated to defend Defendants in an underlying tort action when there is "property damage" arising from an "occurrence." (<u>See, e.g.</u>, Policy at 24). The parties focus on the second question in the Court's two-prong inquiry: whether the allegations in the Underlying Action

---

ECF No. 52-1 at 12; ECF No. 61 at 10; ECF No. 62 at 4; ECF No. 63-1 at 14).

potentially bring the Underlying Plaintiffs' claims within the Policies' coverage of "property damage" arising from an "occurrence."

The parties agree on the law surrounding whether "property damage" is an "occurrence" under a CGL policy. The Policies define an "occurrence" as an "accident." (See, e.g., id. at 37). While the Policies do not define "accident," Maryland common law defines "accident" in this context as an act that "causes damage that is unforeseen or unexpected by the insured." Sheets v. Brethren Mut. Ins. Co., 679 A.2d 540, 548 (Md. 1996). The damages that a party suffers that relate to the satisfaction of the contractual bargain are not unforeseen and, therefore, not an "accident." See Lerner Corp. v. Assurance Co. of Am., 707 A.2d 906, 912 (Md.Ct.Spec.App. 1998). It follows, then, that "when property damage arising out of the insured's defective workmanship is confined to the insured's own work product, the damage is not caused by an 'occurrence' within the meaning of the CGL policy." Woodfin Equities Corp. v. Harford Mut. Ins. Co., 678 A.2d 116, 131 (Md.Ct.Spec.App. 1996), aff'd in part, rev'd in part on other grounds, 687 A.2d 652 (Md. 1997). The corollary of this rule is that there is an "occurrence" under a CGL policy when a subcontractor's defective workmanship causes "property damage" to another contractor's otherwise non-defective work-product. See French v. Assurance Co. of Am., 448 F.3d 693, 703 (4th Cir. 2006).

The parties disagree on whether the Underlying Complaint, FPC's Amended Third-Party Complaint, or Facchina's proposed Fourth-Party Complaint (collectively, the "Underlying Complaints") allege that W. Concrete's purportedly defective placing and

finishing of the concrete caused "property damage" to FPC's otherwise non-defective work-product in the SSTC. The Policies outline two types of "property damage": (1) "[p]hysical injury to tangible property, including all resulting loss of use of that property;" and (2) "[l]oss of use of tangible property that is not physically injured." (See, e.g., Policy at 38). Defendants contend that the Underlying Complaints allege "occurrences" of both types of "property damage." The Court reviews each type of "property damage" in turn.

### a.    Physical Injury to Tangible Property

Defendants assert that the Underlying Complaint—along with the KCE Report—allege that W. Concrete's purportedly defective work caused two forms of "physical injury to tangible property": (1) cracked concrete; and (2) exposed rebar and post-tensioning ducts. Before resolving whether these allegations constitute an "occurrence" of "physical injury to tangible property," the Court first considers whether the KCE Report is extrinsic evidence. As the Court discussed above, the Court may only consider Defendants' extrinsic evidence under limited circumstances. See Walk, 852 A.2d at 106, 107.

Because the Court is sitting in diversity jurisdiction, it applies state substantive law and federal procedural law. See Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co., 736 F.3d 255, 261 n.3 (4th Cir. 2013). Under Federal Rule of Civil Procedure 10(c), a document "that is an exhibit to a pleading is a part of the pleading for all purposes." Here, there is no evidence that the Underlying Plaintiffs attached the KCE Report as an exhibit to the Underlying Complaint. Nevertheless, in the Underlying Complaint, the Underlying Plaintiffs explicitly refer to the

KCE Report. (See Underlying Compl. ¶¶ 114–116). The Court concludes, thus, that the KCE Report is not extrinsic evidence. Cf. Provident Bank of Md. v. McCarthy, 383 F.Supp.2d 858, 860 (D.Md. 2005) (explaining that in deciding a Rule 12(b)(6) motion, the Court may consider documents "referred to in the complaint"). So, the Court may consider the KCE Report without first resolving whether the allegations in the Underlying Complaints conclusively establish or negate a potentiality of coverage. See Walk, 852 A.2d at 106.

###### i.     Cracked Concrete

The Underlying Complaint alleges that the concrete placed on the elevated levels of the SSTC cracked. (Underlying Compl. ¶ 107). The KCE Report describes the cracking as "extensive" and "widespread" and identifies "concrete placement" as one of the causes of the cracking. (Pls.' Mot. Summ. J. Ex. 4 ["KCE Report"] at 4, 6, ECF No. 52-6).[6] Defendants argue that these allegations constitute an "occurrence" because the cracked concrete is Rockville's work-product. For three reasons, the Court is not persuaded and concludes that the cracked concrete is W. Concrete's work-product—not Rockville's.

First, according to the KCE Report, it is what W. Concrete did with the concrete— placing it improperly—that caused it to become defective, i.e., to crack. (See KCE Report at 6) ("The observed cracking appears to be related to . . . concrete placement[.]"). The Underlying Complaint and KCE Report are devoid of any allegation that the concrete itself was defective before or after W. Concrete placed and finished it. It would be unreasonable,

---

[6] When citing to pages in the KCE Report, the Court uses the page numbers in the

then, to conclude that the cracked concrete is Rockville's work-product when it was W. Concrete—not Rockville—that caused it to crack.

Second, this Court has explained that "the 'product' of an insured is the structure or portion thereof that the insured has contracted to provide." Harbor Court Assocs. v. Kiewit Const. Co., 6 F.Supp.2d 449, 452 (D.Md. 1998). For example, "[t]he product of an electrical subcontractor would be the electrical system that the subcontractor was engaged to provide." Id. Here, Facchina engaged W. Concrete to place and finish the concrete. (W. Concrete Subcontract at 10). It follows, then, that the placed and finished concrete, whether it is cracked or not, is W. Concrete's work-product.

Third, according to Defendants' reasoning, the concrete that W. Concrete placed that was thinner than the Prime Contract requirement, like the cracked concrete, would not be W. Concrete's work-product, either. This means that Nationwide could be responsible for defending and indemnifying W. Concrete for the thin concrete. See French, 448 F.3d at 703. The Court cannot countenance this because the Facchina Subcontract provides that W. Concrete agrees to place and finish the concrete in accordance with the Prime Contract. (W. Concrete Subcontract at 10). Permitting contractors, like Defendants, to shift the risk of their own defective workmanship to a liability insurer would not only give contractors no incentive to do conforming work in the first instance, but also it would transmute a CGL policy into a performance bond because the insurer would be liable for the insured's own defective work.

_____

original report, not the page numbers that the Court's case management tool assigned.

This Court has cautioned against transmuting CGL policies into performance bonds. <u>See</u> <u>Reliance Ins. Co. v. Mogavero</u>, 640 F.Supp. 84, 85 (D.Md. 1986). The Court heeds this caution and rejects any assertion by Defendants that would transform the Policies into performance bonds.

Because the cracked concrete is W. Concrete's work-product, the Court further concludes that the allegations in the Underlying Action conclusively establish that Nationwide is not potentially obligated to defend Defendants for causing the cracked concrete. <u>See</u> <u>Woodfin</u>, 678 A.2d at 131.

### ii.    Exposed Rebar and Post-Tensioning Ducts

Both the Underlying Complaint and the KCE Report state that because W. Concrete failed to place concrete at the required thickness, the rebar and post-tensioning ducts became "exposed" on the top surface of the concrete slabs. (<u>See</u> Underlying Compl. ¶¶ 107–08); (<u>see</u> <u>also</u> KCE Report at 6). The KCE Report also suggests that the rebar and post-tensioning ducts inside the concrete slabs became "exposed" because of the cracks in the concrete slabs. (<u>See</u> KCE Report at 8) (explaining that the cracks in the concrete slabs make the slabs vulnerable to water and chloride ion intrusion, which reduces the time before the rebar and post-tensioning ducts begin to corrode). Nationwide does not dispute that according to the Underlying Complaints, the rebar and post-tensioning ducts are not W. Concrete's work-product. Instead, Nationwide argues that there are no allegations that the rebar and post-tensioning ducts sustained any "physical injury." The Court agrees with Nationwide and concludes that the

Underlying Complaints and KCE Report conclusively establish that there is no potential that Nationwide is obligated to defend Defendants for causing the exposed rebar and post-tensioning ducts.[7]  The Court first reviews the allegations in the Underlying Complaints and then turns to the statements in the KCE Report.

### aa.    Underlying Complaints

The Underlying Complaint alleges only that the rebar and post-tensioning ducts "bec[a]me exposed" on the top surface of the concrete slabs when W. Concrete failed to place the concrete to the required thickness.  (Underlying Compl. ¶¶ 107–08).  The Court agrees with Nationwide that as a general matter, just because something is exposed does not mean that it is "physically injured."  (See ECF No. 69 at 6).  In the context of CGL policies, tangible property suffers "physical injury" when it endures a "harmful change in appearance, shape, [or] composition."[8]  Eljer Mfg., Inc. v. Liberty Mut. Ins. Co., 972 F.2d 805, 809 (7th Cir. 1992).  Neither the Underlying Complaint nor Facchina's proposed Fourth-Party Complaint alleges that the rebar or post-tensioning ducts endured such a change.[9]  Facchina's proposed Fourth-Party Complaint alleges only that "there was insufficient concrete cover over the rebar and post-tensioning ducts in some locations."  (Facchina's Fourth-Party Compl. ¶ 20).  In the

---

[7] An insured may not rely on extrinsic evidence when the underlying complaint conclusively negates a potentiality of coverage.  See Walk, 852 A.2d at 106; see also Blackstone, 114 A.3d at 682 (ignoring extrinsic evidence).  Accordingly, because the Foster Affidavits are extrinsic evidence, the Court will not consider them and will deny as moot Nationwide's Motion to strike them (ECF No. 75).

[8] Both Nationwide and Defendants cite this proposition with favor.

[9] FPC's Amended Third-Party Complaint does not address the exposed rebar or post-

absence of any allegation of a "harmful change" or a brief description of the physical injury that the exposed rebar and post-tensioning ducts purportedly sustained, the Court concludes that the Underlying Complaints conclusively establish that the exposed rebar and post-tensioning ducts at the top surface of the concrete slabs did not endure "physical injury."

### bb.    KCE Report

Defendants rely heavily on the KCE Report in attempting to establish that Nationwide is potentially obligated to defend Defendants in relation to the exposed rebar and post-tensioning ducts. The Court focuses only on the statements in the KCE Report on which Defendants rely and reviews them in turn.

The Court begins with the statements concerning the rebar and post-tensioning ducts becoming exposed at the top surface of the concrete slabs. The KCE Report states that a post-tensioning duct "popped out of the concrete." (KCE Report at 3). But the KCE Report does not state that the post-tensioning duct popped out because it was bent, twisted, or otherwise physically damaged. Without any statements concerning physical damage to the post-tensioning duct that may have caused it to pop out of the concrete, the Court reads "popped" to mean merely that the post-tensioning duct "appeared because the concrete was too thin."

The KCE Report later states that "[w]here post-tensioning ducts are exposed, the sheathing <u>can</u> be compromised by vehicular traffic and/or salts" and once the sheathing is compromised, "corrosion <u>would</u> initiate immediately." (<u>Id.</u> at 79) (emphasis added). The

---

tensioning ducts.

Report similarly states that "[p]ost-tensioning ducts that were observed to exposed at the top surface of the post-tensioned slabs or near surface on Levels 330 and 350 are susceptible to premature deterioration in their current condition" and "the ducts are vulnerable to abrading and splitting when exposed to vehicular traffic, which will only be exacerbated when vehicles are equipped with chains during the winter months." (Id. at 95) (emphasis added). In these statements, KCE discusses deterioration, corrosion, and damage in the conditional tense, stating that they could occur if the sheathing on the post-tensioning ducts became compromised or the ducts were exposed to vehicular traffic. Defendants, however, do not identify any statements in the KCE Report that sheathing was compromised or the ducts were exposed to vehicular traffic. And Defendants do not cite a single case in which a court held that the mere threat of or potential for "physical injury" suffices to establish "physical injury."

Moreover, by allegedly becoming "vulnerable" or "susceptible" to damage, the post-tensioning ducts were not "physically injured" because they did not "change in appearance, shape, [or] composition." Eljer, 972 F.2d at 809; (KCE Report at 95). Again, the Underlying Complaints and KCE Report are devoid of any allegation that the post-tensioning ducts broke, twisted, or bent either before, or in the process of, becoming exposed.

The KCE Report further states that "locations with no cover, such as at locations with near surface [rebar] or where post-tensioning ducts are exposed to the surface, will begin to corrode immediately." (KCE Report at 96–97) (emphasis added). In citing this statement, Defendants overlook that the KCE report is discussing corrosion from chloride ions found in

de-icing salts.  (See id. at 95–97).  The Court finds that the statement concerning "immediate" corrosion is also conditional—corrosion would initiate immediately if de-icing salts were applied.  Defendants, however, do not identify any statements that de-icing salts were actually applied.  And, even assuming that de-icing salts were applied, the KCE Report does not state that KCE ever observed corrosion from de-icing salts.

The Court turns, now, to the statements concerning the rebar and post-tensioning ducts becoming exposed inside the concrete slabs because of the cracks in the slabs.  The Court finds that these statements are likewise conditional.  The KCE Report states that "the majority of the cracks extend between 2 inches and 7 inches from the top surface of the slab."  (KCE Report at 94).  Because these depths are greater than the depth of the rebar, "moisture and chloride ions are considered to have direct access to the [rebar], which allows corrosion at these locations to initiate immediately."  (Id.) (emphasis added).  The KCE Report asserts similarly that "at locations with cracks, there is a direct path to the [rebar], and corrosion from chloride ions "initiates immediately."  (Id. at 97) (emphasis added).  According to these statements, corrosion will begin "immediately" if moisture or chloride ions penetrate the cracks.  KCE, however, does not state that moisture or chloride ions actually penetrated the cracks, much less that KCE observed corrosion from moisture or chloride ions.

The Court notes that while the KCE Report does not state that moisture actually penetrated the cracks, the Underlying Complaint does.  The Underlying Complaint alleges that when it rained, water drained into some of the cracks.  (Underlying Compl. ¶ 107).  For two

23

principal reasons, however, the Court still concludes that the KCE Report conclusively establishes that Nationwide is not obligated to defend Defendants in relation to the exposed rebar and post-tensioning ducts.

First, the Underlying Complaint does not allege that rain penetrated those cracks that were deep enough for the rebar or post-tensioning ducts to be exposed inside the concrete slabs. According to the KCE Report, some of the cracks were as shallow as 1/2 inch. (KCE Report at 94).

Second, even if the Underlying Complaint and KCE Report alleged that W. Concrete "physically injured" the rebar and post-tensioning ducts by causing them to corrode from rain water, that allegation is incidental and de minimis when compared to the thrust of the Underlying Action—that W. Concrete's own work-product was defective. In Mogavero, 640 F.Supp. at 84, the plaintiff insurer sought a declaration that it did not have an obligation to defend the defendant builder in an underlying action in which it was alleged that the defendant performed defective work when renovating an apartment complex. Like Defendants here, the defendant in Mogavero argued that the insurer had a duty to defend because the underlying complaint could "be read as asserting claims based upon damage which his poor workmanship caused to work performed by other contractors." Id. at 87. This Court disagreed, characterizing such a reading of the underlying complaint as "quite strained." Id. This Court found it was "clear that the thrust of the claims against [the defendant] is that his own work was defective." Id. Indeed, "[a]ny claim about the consequential effects upon [the

defendant's] poor workmanship upon the work of others is incidental and <u>de minimus</u>." <u>Id.</u> This Court granted summary judgment for the insurer, concluding there was no obligation to defend. <u>Id.</u>

Here, the Court finds that the "thrust" of the Underlying Action, insofar as the Underlying Action relates to only W. Concrete, is that W. Concrete's own work-product is defective—not that W. Concrete's own defective work-product may have caused other contractors' work-product to corrode. The Underlying Complaint alleges that after W. Concrete placed and finished the concrete on the elevated levels of the SSTC, the County observed that not only was the concrete too thin, but also it was cracked and left rebar and post-tensioning ducts exposed. (Underlying Compl. ¶¶ 107–08). The County then lists the deficiencies in W. Concrete's work-product that the KCE Report identifies. Notably, out of all the information discussed in the KCE Report—a detailed one-hundred-page document—the County chose only to include the KCE Report's conclusion that W. Concrete's work-product was too thin. (<u>See</u> <u>id.</u> ¶ 116). And, what is more, the Underlying Complaint never alleges that anyone observed that rain water actually caused corrosion on the rebar or post-tensioning ducts.

As for the KCE Report, it discusses the cracked concrete at length. (<u>See</u> KCE Report at 6, 8, 19, 34–38, 43, 94, 96–97). And the Court has already concluded that the cracked concrete is W. Concrete's work-product. (<u>See</u> <u>supra</u> Section II.B.1.a.i., "Cracked Concrete"). The KCE report focuses on the damage that <u>could</u> occur to other materials because of W.

Concrete's own defective workmanship in causing the concrete to crack and placing it too thinly. (Id. at 80, 95–98). KCE dedicates almost an entire one third of its Report to discussing the extensive testing it conducted on W. Concrete's work-product. (See id. at 41–76). KCE never mentions that it tested the rebar and post-tensioning ducts to ascertain the extent of the damage, if any, that they sustained. Plus, the KCE Report, like the Underlying Complaint, never states that anyone observed corrosion from rain water.

The Court also highlights that the KCE Report does not recommend that the County replace any rebar or post-tensioning ducts. Instead, KCE recommended that the County install an overlay on the top surface of the concrete slabs on the elevated levels of the SSTC, thereby making it more difficult to access to the rebar and post-tensioning ducts for repairs or corrosion remediation. (KCE Report at 9–10). According to the Underlying Complaint, the County accepted this recommendation and directed FPC to install the overlay. (Underlying Compl. ¶ 141). That KCE did not recommend that the County repair or replace rebar or post-tensioning ducts is further support that the gravamen of the Underlying Action is W. Concrete's own defective work—not the corrosion, if any, that W. Concrete's defective work may have caused to other contractors' work.

To summarize, the KCE Report does not specify whether physical injury caused a post-tensioning duct to "pop" out of a concrete slab and the KCE Report only states that the rebar and post-tensioning ducts <u>could</u> sustain physical injury. The Court concludes, therefore, that the KCE Report conclusively establishes that the exposed rebar and post-tensioning ducts—

both at the top surface of the concrete slabs and inside the concrete slabs—did not endure

"physical injury." And because neither the Underlying Complaints nor the KCE Report allege

"property damage" in the form of "physical injury to tangible property," the Court further

concludes that the allegations in the Underlying Action conclusively establish that Nationwide

is not potentially obligated to defend Defendants for causing the exposed rebar and post-

tensioning ducts. Although the KCE Report states that rebar and post-tensioning ducts could

corrode "immediately" if exposed to moisture and the Underlying Complaint alleges that rain

water penetrated some of W. Concrete's work-product, the gravamen of the Underlying Action

is that W. Concrete's own work-product is defective. See Mogavero, 640 F.Supp. at 87.

### b.    Loss of Use of Tangible Property Not Physically Injured

Defendants further contend that the Underlying Complaint alleges an "occurrence" of

"property damage" because it asserts that due to W. Concrete's purportedly defective

workmanship, the County lost use of portions of the SSTC that were not physically injured.

Defendants assert that the County lost use of the SSTC because after the County discovered

the purportedly defective work-product of multiple contractors, the County could not obtain

the Use and Occupancy Permit until the defective work-product was rectified. (See, e.g., ECF

No. 61 at 17). Nationwide contends that even assuming the delay in obtaining the Use and

Occupancy Permit constitutes "property damage," the Underlying Complaint conclusively

establishes that the Policies' exclusion for "Damage to Impaired Property or Property Not

Physically Injured" (the "Exclusion") precludes Nationwide from providing a defense in the

Underlying Action. The Court agrees with Nationwide.

The Exclusion precludes coverage for:

> "Property damage" to "impaired property" or property that has
> not been physically injured, arising out of:
>> (1) A defect, deficiency, inadequacy or dangerous
>> condition in "your product" or "your work"; or
>> (2) A delay or failure by you or anyone acting on
>> your behalf to perform a contract or agreement in
>> accordance with its terms.

(Policy at 28).

The Policies define "impaired property" as:

> tangible property, other than "your product" or "your work," that
> cannot be used or is less useful because:
>> a. It incorporates "your product" or "your work"
>> that is known or thought to be defective, deficient,
>> inadequate or dangerous; or
>> b. You have failed to fulfill the terms of a contract
>> or agreement;
> if such property can be restored to use by the repair, replacement,
> adjustment or removal of "your product" or "your work" or your
> fulfilling the terms of the contract or agreement.

(Id. at 36). The policies define "Your work" as: (1) Work or operations performed by you or

on your behalf; and (2) Materials, parts or equipment furnished in connection with such work

or operations. (Id. at 39).

Defendants assert that the Exclusion does not preclude coverage because the

Underlying Complaint conclusively establishes that there was no "impaired property" in the

SSTC that incorporated W. Concrete's work-product. Defendants contend that there was no

"impaired property" because the Underlying Complaint alleges that the SSTC could not be "restored to use by the repair, replacement, adjustment or removal" of W. Concrete's work only. (Id. at 36). The Court agrees that, indeed, the Underlying Complaint alleges that to obtain the Use and Occupancy Permit, the County was required to rectify the work-product of contractors other than W. Concrete. For example, the Underlying Complaint alleges that to remediate defective design and construction work-product, the County contracted with FPC to reinforce concrete beams and girders. (See Underlying Compl. ¶ 141). Constructing beams and girders was not within W. Concrete scope of work. (See W. Concrete Subcontract).

Regardless of whether there was "impaired property" in the SSTC, Defendants overlook that the Exclusion bars coverage for "'[p]roperty damage' to 'impaired property' or property that has not been physically injured." (Policy at 28) (emphasis added). There is no question that the Underlying Complaint alleges that Defendants' work—whether performed by them or on their behalf—was defective. (See, e.g., Underlying Compl. ¶ 107) (alleging that the concrete placed on the elevated levels of the SSTC cracked and permitted rebar and post-tensioning ducts to become exposed). The Court concludes, thus, that to the extent the Underlying Complaint alleges that the County could not use portions of the SSTC that had "not been physically injured" because of Defendants' defective work, Nationwide is not obligated to defend Defendants for that loss-of-use.

Because the Court finds that the Underlying Complaints and KCE Report conclusively establish that there were no "occurrences" of "property damage" in the form of "physical

injury to tangible property" and the Exclusion precludes coverage for "property damage" to "tangible property that has not been physically injured," the Court will (1) deny Defendants' Cross-Motions for Partial Summary Judgment[10] and (2) grant Nationwide's Motion for Summary Judgment to the extent that Nationwide moves for a declaration that they are not obligated to defend Defendants in the Underlying Action.

### 2. Is Nationwide Obligated to Indemnify Defendants in the Underlying Action?

In their June 30, 2016 joint status letter, the parties agreed that the Court would "proceed first with a determination of the duty to defend and stay all remaining issues . . . pending the conclusion of the Underlying Action." (ECF No. 35 at 2). The parties have not notified the Court that the Underlying Action is resolved or that their agreement has changed. The Court, therefore, will defer ruling on whether Nationwide is obligated to indemnify Defendants in the Underlying Action. See Nautilus Ins. Co. v. BSA Ltd. P'ship, 602 F.Supp.2d 641, 657 (D.Md. 2009) ("Generally, the question of whether a company must indemnify turns on a comparison of the ultimate findings of fact concerning the alleged occurrence with the policy coverage." (emphasis added) (quoting USAA Cas. Ins. Co. v. Mummert, 213 F.Supp.2d 538, 541 (D.Md. 2002))); see also Trice, Geary & Myers, LLC v.

---

[10] Because the Policies do not obligate Nationwide to defend Defendants in the Underlying Action, Defendants are not entitled to a judgment that Nationwide breached the Policies by failing to provide a defense. See Taylor v. NationsBank, N.A., 776 A.2d 645, 651 (Md. 2001) ("To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation.").

<u>Camico Mut. Ins. Co.</u>, 459 F.App'x 266, 277 (4th Cir. 2011) (unpublished) ("[A] declaration as to [the insurer's] duty of indemnification would be premature at this time; such a declaration should instead be made after the underlying actions are resolved."). Accordingly, the Court will also deny without prejudice Nationwide's Motion for Summary Judgment to the extent that Nationwide moves for a declaration that they are not obligated to indemnify Defendants in the Underlying Action.

### III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny without prejudice in part Nationwide's Motion for Summary Judgment (ECF No. 52). The Court will grant the Motion to the extent that Nationwide moves for a declaration that they are not obligated to defend Defendants in the Underlying Action. The Court will deny the Motion without prejudice to the extent that Nationwide moves for a declaration that they are not obligated to indemnify Defendants in the Underlying Action. The Court will also deny Defendants' Cross-Motions for Partial Summary Judgment (ECF Nos. 61–63) and deny as moot Nationwide's Motion to Strike FPC's Reply Affidavits or, in the alternative, for Leave to File Surreply (ECF No. 75). A separate Order follows.

Entered this 4th day of August, 2017

                                        /s/
                           _____
                           George L. Russell, III
                           United States District Judge